# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Wayne's Automotive Center, Inc., Appellant/Respondent,

v.

South Carolina Department of Public Safety,
Respondent/Appellant.

Appellate Case No. 2017-002455

Appeal From The Administrative Law Court
Harold W. Funderburk, Jr., Administrative Law Judge

Opinion No. 5756
Submitted May 1, 2020 – Filed August 12, 2020

**AFFIRMED**

Raymond E. Lark, Jr., of Austin & Rogers, P.A., of
Columbia, for Appellant/Respondent.

Andrew F. Lindemann, of Lindemann, Davis & Hughes,
P.A., of Columbia; and Marcus Keith Gore, of the South
Carolina Department of Public Safety, of Blythewood,
for Respondent/Appellant.

**KONDUROS, J.:** This cross-appeal arises from Wayne's Automotive Center,
Inc.'s (Wayne's) sanction by the South Carolina Department of Public Safety (the
Department) relating to a towing bill issued to a third-party, J.H.O.C., Inc. d/b/a
Premier Transportation (Premier). The Administrative Law Court (ALC) reduced
the sanction issued by the Department from a 120-day suspension from the
Department's wrecker rotation schedule to a 60-day suspension. Wayne's

maintains the ALC erred in not vacating the suspension entirely.  The Department contends the ALC erred in not upholding the 120-day suspension.  We affirm.

**FACTS/PROCEDURAL BACKGROUND**

The Department maintains a list of approved towing service providers to be called in the event of a vehicular accident.  Wayne's applied to be included on the 2016 wrecker rotation list.  Wayne's was approved. The 2016 Wrecker Rotation Fee Schedule (the Schedule) contains a fee of $436 per hour for Class C tows, which are defined as heavy duty tows for vehicles in excess of seventeen thousand pounds.  *See* S.C. Code Ann. Regs. 38-600(E)(3) (2011).  The Schedule does not set a fee for "special operations" related to a Class C tow jobs.  Special operations might include accidents involving clean-up, transportation of cargo, repositioning the vehicle, and/or controlling traffic on the accident scene.[1]  However, the Schedule indicates "a wrecker service may recover the actual cost of rented/subcontracted equipment or labor necessary to accomplish the job."  Proof of these costs must be provided by including an itemized invoice or receipt from the provider with the towing bill.

On February 9, 2016, the South Carolina Highway Patrol placed a routine rotation call to Wayne's Aiken location for a Class C wrecker to tow an overturned tractor-trailer on the I-20 bridge over the Savannah River near the South Carolina/Georgia border.  The tractor-trailer belonged to Premier and contained a large shipment of dog food for a customer, Tractor Supply.  According to Wayne's owner, Jeff Corbett, between 2:00 a.m. and 4:30 a.m., Wayne's sent individuals to the scene and began to dispatch trucks and equipment including apparatuses for traffic control such as digital signs and cones.

Robert Watson was retained by Sentry Insurance Company, Premier's insurer, to coordinate with Wayne's and manage the bill for the towing and related work.  Jeff's wife, Sherry Corbett, is the office manager for Wayne's.  She testified Premier wanted a bill immediately.  Trish Felix, Wayne's chief dispatcher,

---

[1] S.C. Code Ann. Regs. 38-600(F)(2)(a)(2) (2011) ("Special operations are operations involving the process of uprighting an overturned vehicle or returning a vehicle to a normal position on the roadway which requires the use of auxiliary equipment due to the size or location of the vehicle and/or the recovery of a load which has spilled, or the off-loading and reloading of a load from an overturned vehicle performed to right the vehicle.").

hurriedly provided a bill consisting of three invoices on February 11 totaling $67,912.69. A second, single invoice with some additional information/corrections was created by Sherry on February 15 totaling $69,017.19. Via e-mail, Watson disputed numerous charges on the bill and demanded release of the cargo. On February 16, Wayne's revised its bill to $64,783.19. Watson eventually contacted Lieutenant Nicholas King, the wrecker coordinator for Troop 7—Aiken County— on February 19. After reviewing the bill, Lieutenant King spoke with Jeff and explained the problems he found with the bill. He also instructed Jeff he should release the cargo. According to Lieutenant King, Jeff indicated he would revise the bill and release the cargo.

When the cargo issue was not resolved, Lieutenant King spoke with Jeff again, and Jeff indicated, after consulting with others in the business, he would not follow Lieutenant King's recommendations as to the bill and would not release the cargo. On February 26, Wayne's issued Premier a final invoice for $48,633.19 which Premier agreed to pay. Premier paid the invoice by check dated Friday, March 4 at which time Wayne's advised Premier it could pick up the cargo. Premier retrieved the cargo on Monday, March 7.

Meanwhile, also on March 4, Lieutenant King reported Wayne's to Captain A.K. Grice, his troop commander, identifying charges on the bill he thought were unreasonable and recommending Wayne's be permanently removed from the wrecker rotation list. Lieutenant King's report referenced overcharging for certain laborers, double billing in some instances, and noted Wayne's had not released the cargo.

Pursuant to procedure, Captain Grice reviewed Lieutenant King's report and advised his supervisor, Captain C.B. Hughes, he also believed Wayne's committed numerous violations and should be removed from the wrecker rotation list. Captain Hughes took these recommendations under advisement, and determined Wayne's should be suspended from the wrecker rotation list for 120 days.[2] Wayne's appealed that decision to Colonel Michael Oliver who affirmed the 120-

---

[2] The record does not reveal any specific guidelines the Department should follow regarding the length of suspension for a particular violation or when removal from the wrecker rotation list is warranted. General categories of sanctions are outlined in the Department's Wrecker Rotation Disciplinary Policy and appear to be at the discretion of the Department. They include oral reprimand, written reprimand, immediate suspension, suspension for cause, and removal.

day suspension. Wayne's appealed to the ALC and also filed a motion to stay the suspension.[3]

At the hearing before the ALC, the Department was found to bear the burden of proving by the preponderance of the evidence the sanction was warranted and therefore the proceeding constituted a de novo review of the Department's decision. Watson testified during the Department's case-in-chief and estimated the time taken for the recovery was much too long in his experience and Wayne's had refused to release the cargo to him. He also outlined other charges he felt were too high for equipment. Lieutenant King testified consistently with his aforementioned report. He indicated he was not a rate expert and the items he felt were unreasonably charged were based on "common sense."

In addition to being Wayne's office manager, Sherry testified she is also the majority owner of Spill Containment Incident Management (SCIM), which provided communication equipment and a truck with cleanup supplies to Wayne's at the accident scene. SCIM did not provide or include a separate invoice for work it performed on the accident. Additional labor was obtained from Vern's Wrecker and Recovery (Vern's), and a separate invoice for that work was likewise not included with the Wayne's invoice. Sherry testified equipment and labor from SClM and Vern's was marked up on Wayne's invoices from its actual cost to cover Wayne's liability, taxes, and insurance expenses. Furthermore, equipment invoices included an operator for heavy equipment even though such labor should be included in the base charge for the heavy equipment. Sherry also explained the invoices were adjusted as it learned some items were not needed at the scene as long as previously thought and air bags damaged in lifting the trailer could be repaired as opposed to replaced.

Jeff testified primarily as to the accident scene and indicated the operation was complex. He stated Watson did not necessarily understand everything involved with the matter, particularly the recovery, repacking, transport, and storage of the dog food.

Wayne's offered the testimony of Douglas Busbee, a long-time wrecker business owner/operator. Wayne's attempted to elicit testimony from Busbee regarding issues between towing companies and the Department and subsequent changes made to the 2017 rate schedule. However, the ALC limited Busbee's testimony to

---

[3] Wayne's served four days of the suspension, December 12-16, before the parties agreed to a temporary stay.

his opinion on whether Wayne's charges were reasonable. In that regard, Busbee testified the Department's assessment of the charges was unreasonable, and he testified as to what he generally billed for certain services in 2016.[4]

Finally, Martha Rochester testified on Wayne's behalf as an expert in towing and recovery charges and billing. She testified Wayne's rates for the accident and the amount of time to conduct the entire operation were reasonable. Rochester testified wrecker companies build in costs for being ready to serve when called and, as with any business, rates must cover employees' costs beyond salary such as insurance. She also stated the costs for cones was reasonable, and in her opinion, the dog food was commercial cargo as opposed to personal property. She acknowledged the $436-per-hour charge for heavy-duty equipment would include an operator although a dispatcher could send a second party out with a vehicle if necessary, which would be an additional labor cost.

The ALC determined Wayne's had double-billed some items and failed to present documents supporting the subcontracted labor and equipment costs from Vern's and SCIM in the final invoice issued to Premier. It determined the final invoice was the proper invoice for evaluation because Wayne's had taken corrective measures and made adjustments to its prior invoices. The ALC also determined the cargo constituted personal property that should be released. However, the ALC went on to consider the "knotty" issue presented to a towing company as to determining the owner of the cargo when its shipment is interrupted mid-transport as in this case. Based on all of the foregoing, the ALC determined Wayne's should be sanctioned with a suspension from the wrecker rotation list, but reduced the suspension to 60 days. This cross-appeal followed.

**STANDARD OF REVIEW**

Section 1-23-610(B) of the South Carolina Code (Supp. 2019) sets forth the standard of review for appeals from the ALC. It provides:

> The review of the [ALC]'s order must be confined to the record. The court may not substitute its judgment for the

---

[4] This included the following: $436 per hour for a heavy duty wrecker and operator; $350 per hour for a landoll; $85 per hour for labor; $125 per hour for mechanic labor; $150 per hour for a skid steer; $300 per hour for a truck/trailer; $200 per hour for a backhoe; $150 per hour for a forklift; $250 per hour for a service truck; and $125 per hour for tower lights.

judgment of the [ALC] as to the weight of the evidence on questions of fact. The court of appeals may affirm the decision or remand the case for further proceedings; or, it may reverse or modify the decision if the substantive rights of the petitioner have been prejudiced because the finding, conclusion, or decision is:

(a) in violation of constitutional or statutory provisions;
(b) in excess of the statutory authority of the agency;
(c) made upon unlawful procedure;
(d) affected by other error of law;
(e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
(f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"Substantial evidence is not a mere scintilla of evidence, but evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion the agency reached." *Holmes v. Nat'l Serv. Indus., Inc.*, 395 S.C. 305, 308, 717 S.E.2d 751, 752 (2011) (quoting *Pierre v. Seaside Farms, Inc.*, 386 S.C. 534, 540, 689 S.E.2d 615, 618 (2010)). "[A] judgment upon which reasonable men might differ will not be set aside." *Id*. at 309, 717 S.E.2d at 752.

**LAW/ANALYSIS**

**Wayne's Appeal**

> **I.      Wayne's Suspension Should be Vacated in its Entirety**
>
> **A. Settlement by Payment of Bill**

Wayne's argues the payment of the final invoice by Premier ended any dispute between them, rendering the Department's investigation into the matter moot. We disagree.

"An appellate court will not pass judgment on moot and academic questions; it will not adjudicate a matter when no actual controversy capable of specific relief exists." *Sloan v. Greenville County,* 380 S.C. 528, 535, 670 S.E.2d 663, 667 (Ct. App. 2009). "A case becomes moot when judgment, if rendered, will have no practical legal effect upon the existing controversy." *Id.* "Mootness also arises

when some event occurs making it impossible for the reviewing court to grant effectual relief." *Id*.

The Department is given statutory authority to discipline members of the wrecker rotation list for noncompliance with its requirements. Wayne's agreed to this when it joined the wrecker rotation list.[5] The issue before this court is not whether Wayne's must revise its bill to Premier, but whether the suspension imposed by the Department will be upheld. Because the ALC stayed the suspension, the issue is not moot and has implications for whether and for how long Wayne's will have to serve any suspension. Consequently, we find no merit to this argument by Wayne's and affirm the ALC's decision that the matter was not ended by Premier's payment of the disputed bill.

## B. One Bill Versus Listing Subcontractor Costs

Next, Wayne's argues the ALC erred in concluding the Department correctly found Wayne's violated the billing requirements by failing to include the costs for renting additional equipment to perform the special operation from subcontractors or other companies. We disagree.

Regulation 38-600(C)(15) of the South Carolina Code (2011) requires that tow services provide the client with one bill. It states:

> A wrecker service may secure assistance from another wrecker service when necessary to complete the recovery; however, this does not supersede paragraph 3 of this section nor does it permit wrecker services to accept a rotation call and dispatch the call to secondary wrecker services. Only one bill is to be submitted to the owner or operator for the work performed.

*Id*. The Schedule indicates subcontractor costs must be evidenced by an invoice. It provides:

---

[5] The 2016 Schedule was signed by a representative of the towing company and provides "I understand that any violation of the Wrecker Regulations may result in disciplinary action pursuant to S.C. Code of Regulations 38-600(D) and [the Department] Policy 200.19 Wrecker Rotation Disciplinary Policy."

Although no Special Operations fee is set for Class C tows, a wrecker service may recover the actual cost of rented/subcontracted equipment or labor necessary to accomplish the job. Proof of these actual costs in the form of an itemized invoice or receipt from the third party providing such equipment or labor must accompany the tow bill.

If services beyond those for which the wrecker was dispatched are performed (e.g., hazardous waste cleanup; transportation of vehicle, cargo, or occupants(s) to an agreed upon location other than the one required by the Regulation), those services must be billed on a separate invoice.

Wayne's contends these two provisions are contradictory and it should not be penalized for sending a bill without supporting documentation to Premier. We disagree.

"[I]t is well settled that statutes dealing with the same subject matter are *in pari materia* and must be construed together, if possible, to produce a single, harmonious result." *Beaufort County v. S.C. State Election Comm'n*, 395 S.C. 366, 371, 718 S.E.2d 432, 435 (2011). Although the two provisions at issue are not statutes—one is a regulation related to tow billing and the other is a policy made under the auspices of regulations and related to tow billing—they should be read to harmonize if possible. According to Lieutenant King, the Department interprets the regulation at issue to mean a tow customer should not receive multiple bills directly from the provider of the additional services. Rather, the fee-schedule requirement makes the lead towing company responsible for ensuring each additional labor or rental charge from another entity or for additional services is proven for the customer in the one bill it receives from the main tow company. This explanation would harmonize the regulation and fee provision in a reasonable manner and give them both effect. Consequently, although the two directives are not perfectly clear, Wayne's refusal to provide documentation, even after Lieutenant King's instructions to do so, provides substantial evidence to support the 60-day suspension.

### C. Constitutional Right to Contract

Wayne's maintains allowing the Department to sanction Wayne's after Premier paid the final bill impaired its right to contract.  We disagree.

"To establish a contract clause violation, Appellant must show: (1) the existence of a contract; (2) the law changed actually impaired the contract and the impairment was substantial; and (3) the law was not reasonable and necessary to carry out a legitimate government purpose."  *Anonymous Taxpayer v. S.C. Dep't. of Revenue*, 377 S.C. 425, 433, 661 S.E.2d 73, 77 (2008).  However, two points render the argument unpersuasive.  First, Wayne's contract with Premier is a *fait accompli* and the imposition of a 60-day suspension, while punitive, did not impair its right to contract.  Second, these rules and regulations were in place at the time Wayne's signed the agreement, so no "change" in the law occurred that could have impaired the contract.  Again, this argument is without merit and we affirm the ALC.

## II.       Location of Accident—South Carolina or Georgia

Wayne's contends the ALC erred in finding the accident in question occurred in South Carolina.  Wayne's alleges the accident occurred in Georgia and is subject to Georgia law or if not, is preempted by federal law as part of interstate commerce.  We disagree.

The ALC concluded in its order that "[t]his case arises within a South Carolina regulatory scheme in which a South Carolina business participating in that regulatory scheme was summoned by the South Carolina Highway Patrol to perform services subject to the administration of that regulatory scheme.  Under these circumstances, South Carolina jurisdiction is proper."

The record demonstrates Wayne's is licensed to operate in both South Carolina and Georgia.  A Georgia-only wrecker service, Chancey's, arrived at the accident scene but was sent away in favor of Wayne's.  Wayne's was called by the Department and did the majority of the recovery on the South Carolina side of the accident.

In any event, Wayne's, by accepting the call from the Department, agreed to function under the guidelines set by it for membership on the wrecker rotation list. Parties can agree by contract to be governed by particular laws, rules, and regulations.  *See Skywaves I Corp. v. Branch Banking & Tr. Co.*, 423 S.C. 432, 448-49, 814 S.E.2d 643, 652 (Ct. App. 2018) ("Generally, under South Carolina choice of law principles, if the parties to a contract specify the law under which the contract shall be governed, the court will honor this choice of law.").  Substantial evidence in the record supports the ALC's decision on this issue.

### III. Advisory Committee

Next, Wayne's argues the ALC erred in concluding the failure of the Department to establish an advisory committee pursuant to Regulation 38-600(D) did not violate Wayne's due process rights. We disagree.

Regulation 38-600(D)(5) of the South Carolina Code (2011) provides:

> An advisory committee, consisting of experts in the towing and towing related industries, will be created to review, upon request by the Department, complaints specific to the terms and conditions of this regulation. The advisory committee will be limited to reviewing specific issues raised in a complaint or appeal and making recommendations regarding the validity of the complaint as well as a fair and reasonable resolution. Advisory committee recommendations will not supercede Department of Public Safety policy nor will the committee make recommendations regarding disciplinary action for Department of Public Safety employees.

*Id*.

In its order, the ALC found

> [Wayne's] complains that [the Department] violated the regulation by not creating this Advisory Committee. However, the review referenced could only occur "upon request by the Department." Furthermore, its review would be limited to "specific issues raised in a complaint or appeal," and its "recommendations regarding the validity of the complaint as well as a fair and reasonable resolution" cannot "[supersede the Department's] policy." Hence, while the Department may have erred in failing to create an Advisory Committee, it is not obligated to use the committee or to follow its recommendations.

While this is all true, section (E) of the Disciplinary Policy created by the Department indicates that when the patrol commander's decision is appealed, the

patrol commander "shall request that the advisory committee review the appeal and make recommendations before making a final decision." This appears to make seeking input from the advisory committee mandatory. However, the following section (F) of the Disciplinary Policy indicates, in line with the regulation, that the patrol commander "*may* use the recommendations of the advisory committee as a basis for his decision." In sum, the advisory committee is just that, advisory, and does not confer any additional rights on the petitioner.

Even if the advisory committee creates additional due process rights for a petitioner, our courts have held a defect that deprives a party of a de novo review in an administrative law matter can be cured if the de novo review is subsequently commenced in another proceeding. *See Unisys Corp. v. S.C. Budget & Control Bd.*, 346 S.C. 158, 174, 551 S.E.2d 263, 272 (2001) ("An adequate *de novo* review renders harmless a procedural due process violation based on the insufficiency of the lower administrative body."). Because the ALC conducted a de novo review of this case, we conclude the ALC did not err in proceeding with the hearing.

## IV. Inconsistent Order

Wayne's maintains the ALC's order is inconsistent. It argues the ALC's finding as to the cargo release issue that certain expenses on the invoice were reasonable is inapposite to the imposition of a 60-day suspension. We disagree.

The ALC reduced the 120-day suspension imposed by the Department. The reduction is consistent with the ALC's findings that generally favored Wayne's. Allowing 60 days of the suspension to remain in effect is consistent with the ALC's findings as to Wayne's double billing for certain labor charges and its failure to provide invoices for rented subcontractor equipment. Overall, substantial evidence supports the reduction but not elimination of the suspension. *See* S.C. Code Ann. § 1-23-60 (B) (noting the appellate court will not substitute its judgment for that of the ALC).[6]

---

[6] We conclude the remaining arguments raised by Wayne's are abandoned on appeal because they are either conclusory, not supported by cited authority, or otherwise vague. *See Potter v. Spartanburg Sch. Dist. 7,* 395 S.C. 17, 24, 716 S.E.2d 123, 127 (Ct. App. 2011) ("An issue is deemed abandoned if the argument in the brief is not supported by authority or is only conclusory."); *see also Jones v. Lott*, 387 S.C. 339, 346, 692 S.E.2d 900, 903 (2010) (noting "broad general statements of issues may be disregarded by this court," and the court should not have to "grope in the dark" to ascertain the precise points at issue), *abrogated on*

**The Department's Appeal**

**I.       Release of Cargo**

The Department argues the ALC erred in reducing Wayne's suspension when it concluded the cargo should have been released.  We disagree.

Section 56-5-5635(F) of the South Carolina Code (2018) provides:

> After the vehicle is in the possession of the proprietor, owner, or operator of the towing company, storage facility, garage, or repair shop, the owner of the vehicle as demonstrated by providing a certificate of registration has one opportunity to remove from the vehicle any personal property not attached to the vehicle.  The proprietor, owner, or operator of the towing company, storage facility, garage, or repair shop must release any personal property that does not belong to the owner of the vehicle to the owner of the personal property.

Although the ALC determined cargo falls within the parameters of "personal property," it also held Wayne's was in "legal limbo" because it could not ascertain the legal owner of the dog food and therefore prudently did not release the cargo.  The record more likely reflects that Wayne's was holding the cargo hostage until payment of the bill as opposed to having reservations about ownership issues.  An email from Sherry on February 16 indicated the cargo, tractor, and trailer would be released when the bill was paid.  This was also her testimony at trial as well as Watson's understanding of the matter.  While we do not necessarily agree that Wayne's motives in holding the cargo were as altruistic as the ALC suggests, the record demonstrates Wayne's failure to release the cargo immediately was not as clear cut as the Department suggests.

First, the record shows the initial demands for the cargo were made by Watson, who had not provided definitive evidence that he was acting on behalf of the owner of the cargo.  He never made any specific references to whom the cargo should be released or on what basis.  Watson admitted he had no direct engagement

---

*other grounds by Repko v. Cty. of Georgetown*, 424 S.C. 494, 818 S.E.2d 743 (2018).

agreement with any of the parties. According to Captain Grice's Notice of Disciplinary Action, Tractor Supply was the owner of the cargo, not Premier, and therefore, the dog food should have been released to it immediately pursuant to statute. Sherry Corbett asked for verification from Travelers, Tractor Supply's insurer, that Watson was acting on its behalf and received such verification by email on February 19, around the time Premier engaged an attorney to get involved in the matter.

Furthermore, the statute at issue is subject to a certain amount of interpretation as thousands of pounds of dog food are not the type of personal property contemplated by the statutes and regulations. Sherry testified she did not understand the statute to include cargo, but items like medicine, cell phones, etc. *See* S.C. Code Ann. Regs. 38-600(C)(6) (2011) ("The wrecker service location shall have an agent present during business hours and at the request of the owner of the towed vehicle or his designee, the wrecker service must immediately release personal items such as medicines, medical equipment, keys, clothing, and tools of the trade, child restraint systems and perishable items."). Rochester testified in her opinion, cargo would not fall within the same category as personal property. Lieutenant King indicated Jeff stated he would not release the cargo because he did not believe he was required to do so after consulting with others.

Based on the circumstances of this case, we find substantial evidence supports the ALC's decision to reduce Wayne's sanction in spite of its failure to release the cargo earlier. *See Rose v. S.C. Dep't of Prob., Parole & Pardon Servs.*, 429 S.C. 136, 142, 838 S.E.2d 505, 509 (2020) ("In determining whether the ALC's decision was supported by substantial evidence, [appellate courts] need only find, looking at the entire record on appeal, evidence from which reasonable minds could reach the same conclusion that the ALC reached." (quoting *Barton v. S.C. Dep't of Prob. Parole & Pardon Servs.*, 404 S.C. 395, 401, 745 S.E.2d 110, 113 (2013))).

## II.     Evaluation of Corrected Bill

Next, the Department argues the ALC erred in evaluating the final invoice instead of the second invoice for infractions. We disagree.

The record establishes Premier's insurer requested a bill from Wayne's immediately following the accident. That first invoice was therefore hurriedly compiled and could have understandably contained errors. According to Rochester, an early bill like that should only be considered an estimate. The second invoice, issued only

four days later, still contained numerous charges disputed by Watson and totaled $69,017.19. The final invoice that was paid by Premier totaled $48,633.19. The charges had been re-evaluated and adjusted based on new information learned as the bill was further reviewed. For example, the charge for airbags was initially higher when Wayne's thought they would require replacement. This reduced the bill by $8,000. Also, Wayne's discovered one of the heavy pieces of equipment was not on scene as long as previously thought. This reduced the bill further by $5,000. Wayne's specifically refused to make all the changes required by Lieutenant King or to release the cargo at his behest. This conduct suggests the changes Wayne's did make were legitimate corrections as opposed to an acknowledgement by Wayne's that it had overbilled and made corrections only to evade reprimand by the Department.[7]

The Department's analogy to the utterance of a fraudulent check is misplaced. In this case, Wayne's was asked to rapidly prepare a detailed invoice regarding a complex special operation. Certain facts and circumstances changed or were spotted as errors and the entire situation began and concluded in less than a month. Under these circumstances, we conclude substantial evidence in the record supports the ALC's decision to evaluate the final bill for infractions. *See* S.C. Code Ann. § 1-23-610(B) (finding the appellate court must affirm the ALC when substantial evidence in the record supports its decision).

### III.    Charges for Communications Equipment/Supply Truck

Finally, the Department alleges the ALC erred in its findings regarding communications equipment and the supply truck used in the recovery. We disagree.

The ALC found the Department's reasonable charge analysis based on the purchase cost of the items was flawed. Wayne's expert testified the costs for equipment would include the availability of the truck, its maintenance, and restocking it with supplies as opposed to just the cost to purchase the vehicle. She also opined the charge of the communications equipment was reasonable and in line with what she had seen charged. Based on the foregoing, we find substantial evidence supports the ALC's ruling. *See* S.C. Code Ann. § 1-23-610(B) (finding the appellate court

---

[7] Jeff specifically told Lieutenant King he would not make the changes he suggested and would face any resulting consequences.

must affirm the ALC when its decision is supported by substantial evidence in the record).  Accordingly we affirm these findings by the ALC.

**CONCLUSION**

On balance, some of the ALC's findings were more favorable to Wayne's and some were more favorable to the Department.  Although reasonable persons might disagree on certain specific findings, substantial evidence supported them.  Overall, the ALC's Solomonic decision to reduce the suspension by half is supported by substantial evidence in the record and is one for which the court should not substitute its judgment.  Therefore, the decision of the ALC is

**AFFIRMED.**[8]

**WILLIAMS and HILL, JJ., concur.**

---

[8] We decide this case without oral argument pursuant to Rule 215, SCACR.